IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RANDALL JONES, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 06-CV-276-TCK-PJC** |
| | ) | |
| (1) OSAGE COUNTY; | ) | |
| (2) THE BOARD OF | ) | |
| COUNTY COMMISSIONERS FOR | ) | |
| OSAGE COUNTY; and | ) | |
| (3) COUNTY COMMISSIONER | ) | |
| CLARENCE L. BRANTLEY, | ) | |
| individually, | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Before the Court are Defendant Board of County Commissioners for Osage County's

Motion for Summary Judgment (Doc. 33) and Defendant Clarence L. Brantley's Motion for

Summary Judgment (Doc. 34).

**I.      Factual Background**

Plaintiff Randall Jones ("Jones") began his career with Osage County in 1980 at the

age of seventeen.  Jones worked in various positions until he eventually became First Deputy

for District 1 of Osage County ("District 1").[1]  As First Deputy for District 1, Jones was

second in command under Defendant County Commissioner Clarence Brantley ("Brantley")

and was responsible for the supervision, hiring, firing, and discipline of approximately thirty

employees.  Jones was also responsible for daily operations of road maintenance and

---

[1]  The position of "First Deputy" in Osage County is also referred to as "Road
Superintendent."  For purposes of this Order, the Court refers to Jones's position as "First
Deputy."

1

construction in District 1.  Over time, Jones became concerned that Brantley was engaging in improper conduct such as self-dealing, misappropriation of county funds, and misuse of county property.  Jones reported these concerns to certain individuals on various occasions. On January 6, 2005, Brantley terminated Jones.  Following his termination, Jones reported Brantley's misconduct to the Office of the Auditor and Inspector for the State of Oklahoma ("State Auditor's Office").  After conducting a special audit, the State Auditor's Office found Brantley committed at least ten violations of Oklahoma law as set forth in a report dated December 15, 2005 ("Audit Report").[2]

On May 26, 2006, Jones brought this lawsuit alleging three causes of action arising from his termination.  Jones alleged that Osage County, Brantley, and the Board of County Commissioners for Osage County ("Board") terminated him in retaliation for exercise of his First Amendment rights, in violation of 42 U.S.C. § 1983.  Jones further alleged that Osage County and Board wrongfully terminated him in violation of Oklahoma public policy.  Jones finally alleged that Osage County and Board breached an implied contract with Jones because Brantley terminated Jones without following an incremental discipline policy.  On May 7, 2007, Osage County was dismissed from the lawsuit by agreement of the parties. On August 14, 2007, Board and Brantley filed separate motions for summary judgment.

## II.     Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists.

---

[2] The Audit Report is attached as Exhibit H to Plaintiff's Response to Board's Motion for Summary Judgment.

*See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006) (citation omitted). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

## III.    Section 1983 Claim - Defendant Brantley

Jones alleged that Brantley terminated him in retaliation for Jones's exercise of his First Amendment right to speak out on a matter of public concern, in violation of 42 U.S.C. § 1983.   Brantley moved for summary judgment based on the doctrine of qualified immunity.   When a defendant asserts qualified immunity at the summary judgment stage, the responsibility shifts to the plaintiff to demonstrate that the defendant's actions violated a constitutional or statutory right, and that the right at issue was clearly established at the time of the defendant's allegedly unlawful conduct.   *See Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1327 (10th Cir. 2007).   As to the first inquiry, a court must "ask whether the facts alleged, viewed in the light most favorable to the party asserting injury, show the official's conduct violated a constitutional right."   *Douglas v. Dobbs*, 419 F.3d 1097, 1100 (10th Cir. 2005).   As to the second inquiry, "a court must ask whether it would be clear to a reasonable [public official] that his conduct was unlawful in the situation he confronted."   *Id.* (quotation omitted).

### A.    Constitutional Violation

The Supreme Court has long recognized that "the government's interest in regulating the speech of its employees differs significantly from its interest in regulating the speech of the public in general."   *Deschenie v. Bd. of Educ.*, 473 F.3d 1271, 1276 (10th Cir. 2007).

3

When a citizen accepts public employment, "'the citizen by necessity must accept certain limitations on his or her freedom.'" *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1202 (10th Cir. 2007) (quoting *Garcetti v. Ceballos*, __ U.S. __, 126 S. Ct. 1951, 1958 (2006)).  In determining whether a public employer impermissibly retaliated against a public employee in violation of the employee's First Amendment rights, the Tenth Circuit has instructed courts to utilize a five-part test based on the Supreme Court cases of *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006).  *See Brammer-Hoelter,* 492 F.3d at 1202-03.  The *Garcetti/Pickering* analysis requires the following steps:

> First, the court must determine whether the employee speaks pursuant to [his] official duties.  If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech simply reflects the exercise of employer control over what the employer itself has commissioned or created.[3]  Second, if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern.  If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends. Third, if the employee speaks as a citizen on a matter of public concern, the court must determine whether the employee's interest in commenting on the issue outweighs the interest of the state as employer. Fourth, assuming the employee's interest outweighs that of the employer, the employee must show that his speech was a substantial factor or a motivating factor in [a] detrimental employment decision.  Finally, if the employee establishes that his speech was such a factor, the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech.

*Id.* (internal citations and quotations omitted) (footnote added).  "The first three steps are to be resolved by the district court, while the last two are ordinarily for the trier of fact."  *Id.*; *see also Weaver v. Chavez*, 458 F.3d 1096, 1100 (10th Cir. 2006) ("The first two inquiries

---

[3]  The first step was added by the Tenth Circuit in 2007 based on the Supreme Court's decision in *Garcetti*.  *See Brammer-Hoelter,* 492 F.3d at 1202.

are questions of law for the court to decide because they concern whether the expression at issue is subject to the protection of the First Amendment.  The third and fourth steps are questions to be resolved by the jury because they concern causation.") (quotation and citation omitted).[4]

### 1.   Speech Pursuant to Official Duties

The Supreme Court has not articulated a framework for determining whether speech falls within the scope of a public employee's official duties; however, the Tenth Circuit has offered the following guidance:

> [S]peech is made pursuant to official duties if it is generally consistent with the type of activities [the employee] was paid to do. An employee's official job description is not dispositive, however, because speech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform. *The ultimate question is whether the employee speaks as a citizen or instead as a government employee - an individual acting in his or her professional capacity.* Consequently, if an employee engages in speech *during the course of performing an official duty and the speech reasonably contributes to or facilitates the employee's performance of the official duty,* the speech is made pursuant to the employee's official duties.  At the same time, not all speech that occurs at work is made pursuant to an employee's official duties.  Nor is all speech about the subject matter of an employee's work necessarily made pursuant to the employee's official duties.

*See Brammer-Hoelter,* 492 F.3d at 1203-04 (emphasis added).  In making the determination, a court "must take a practical view of all the facts and circumstances surrounding the speech and the employment relationship."  *Id*. at 1204; *see also Garcetti*, 126 S. Ct. at 1961 ("The proper inquiry is a practical one.").

Brantley contends that all relevant speech in this case was made pursuant to Jones's official duties and is therefore unprotected.  As the starting point for its analysis, the Court

---

[4]  *Weaver* was decided in 2007 and therefore refers to a four-step test.

must "determine what speech and conduct is at issue" and then "examine [the employee's] job description." *Green v. Bd. of County Comm'rs*, 472 F.3d 794, 799-800 (10th Cir. 2007). Determining what speech is "at issue" is not an easy task in this case.  In his summary judgment motion, Brantley limited his analysis of the "official duty" inquiry to two categories of speech: (1) discussions between Jones and Scott Hilton ("Hilton"), the Osage County Commissioner for District 2, relating to Brantley's alleged improper rehiring of drug users and improper use of inmates on the county fairgrounds; and (2) "generalized rumors of Jones's alleged 'bad-mouthing' of Brantley."  (*See* Board's Mot. for Summ. J. 12.) Brantley limited his analysis in this manner because, according to Brantley, these were the only communications of which Brantley was aware at the time of Jones's termination. (*See id.*)  However, the Court must construe Jones's allegations of protected speech in their most favorable light for purposes of identifying what speech is at issue and for purposes of completing its initial legal analysis.  *See Green*, 472 F.3d at 799 (construing record in light most favorable to plaintiff in identifying speech at issue).  Further, for reasons explained below, the Court finds that questions of fact exist regarding the extent and nature of Brantley's awareness of Jones's public speech.  Accordingly, the Court will not limit its analysis to the categories of speech identified by Brantley.

Construing Jones's allegations of protected speech in their most favorable light, the Court has identified seven categories of allegedly protected speech: (1) communications from Jones to Kelly Corbin ("Corbin"), an employee of the Oklahoma State Auditor's Office (*see* Pl.'s Resp. to Brantley's Mot. for Summ. J. at Undisputed Facts Nos. 22-30; *see also* Corbin Dep., Ex. B to Pl.'s Resp. to Board's Mot. for Summ. J., at 30, 31, 33-35) ("Corbin communications"); (2) communications from Jones to R.J. Walker ("Walker"), Director of

the Osage Nation Transportation Improvement Program (*see* Jones Aff., Ex. A to Pl.'s Resp. to Board's Mot. for Summ. J., at ¶ 22; *see also* Walker Dep., Ex. G. to Pl.'s Resp. to Board's Mot. for Summ. J., at 27) ("Walker communications"); (3) communications from Jones to Hilton (*see* Jones Aff. ¶¶ 5, 7, 9, 12, 13; *see also* Hilton Dep., Ex. F to Pl.'s Resp. to Board's Mot. for Summ. J., at 27, 30, 38) ("Hilton communications");  (4) communications from Jones to Betty Parks ("Parks"), Brantley's secretary (Pl.'s Resp. to Board's Mot. for Summ. J. at Additional Material Fact No. 13; *see also* Parks Dep., Ex. E to Pl.'s Resp. to Board's Mot. for Summ. J., at 24-27) ("Parks communications"); (5) communications from Jones to Rita Parsons ("Parsons"), a purchasing agent for Osage County (Parsons Decl. ¶ 4;[5] Jones Aff. ¶ 11) ("Parsons communications"); (6) communications from Jones to Denise Hudson ("Hudson"), who officed in the same area as Parsons (Parsons Decl. ¶ 6; Jones Aff. ¶ 11) ("Hudson communications"); and (7) other communications in which Jones "made Brantley's activity know[n] to numerous people" as well as the "general public" (*see* Jones Aff. ¶¶ 11, 12) ("other communications").  The seven categories of communications set forth

---

[5] The Declaration of Rita Parsons ("Parsons Declaration") is attached as Exhibit A to Jones's Application for Leave to File Supplemental Declaration of Facts in Response to Defendants' Motions for Summary Judgment (Doc. 82), which was filed on January 10, 2008.  Upon receipt of such motion, the Court continued the trial date and allowed time for briefing.  After consideration of such briefing, the Court concludes the motion should be granted.  The Parsons Declaration is relevant to the issues presented, and Defendants have not shown that they will suffer prejudice as a result of this allowance.  The only prejudice alleged is delay of the litigation.  Accordingly, for good cause shown, Plaintiff's motion to supplement (Doc. 82) is granted, and the Court has considered the Parsons Declaration as part of the summary judgment record.  *See generally Turner v. Reynolds Ford, Inc.*, 145 F.3d 1346, at * 7 (10th Cir. 1998) (whether to allow supplementation of a summary judgment response is within the trial court's discretion).

above occurred at a point in time prior to Jones's termination.[6]  In general, the topics Jones

discussed with these individuals involved various allegations of Brantley's misuse of county

funds, misuse of county property, or other allegations of improper conduct.

Next, the Court must examine Jones's job description.  The position of "Deputy"

within a county is created by Oklahoma statute.  Okla. Stat. tit. 19, § 161(2) ("'Deputy'

means one or more regular employees appointed to assist a county officer in the performance

of the official duties of the county officer.").  Deputies are "chargeable with all the duties

of such principal officer, while subject to the direction of the same."  *Id.* § 180.65(B).

Oklahoma law further explains the appointment and function of county deputies:

> Subject to the approval of the county excise board, every county officer shall
> appoint such regular and special deputies as are essential to the performance
> of the duties of the office in an efficient manner and shall fix their salaries
> and compensation. . . .  *It shall be the responsibility of the board of county
> commissioners to cause such job descriptions and salary levels to be
> established.*

*Id.* § 162 (emphasis added).

In Osage County, the Board has not established a written job description for first

deputies.  However, Jones's job description is undisputed in this case:

> [The First Deputy] acts under the Commissioner as the second in command.
> As such, he steps into the Commissioner's position when the Commissioner
> is out of office.  Among his responsibilities as First Deputy, [Jones] assisted
> in the hiring, firing, and discipline of District 1 employees.  He carried out
> the day-to-day operations of road maintenance and construction duties for
> District 1.  He supervised approximately 30 employees, and supervised and
> monitored the progress of road projects within District 1.

---

[6]  The complaint filed by Jones with the State Auditor's Office occurred at a point
in time after Jones's termination and cannot give rise to liability.  *See Casey*, 473 F.3d at
1332 n.9 (noting that superintendent's reporting to FBI could not give rise to liability
because reporting took place after adverse employment action).

(*See* Brantley's Mot. for Summ. J. at Fact Nos. 6-8.)  Brantley described Jones's job as serving as Brantley's "right-hand man."  (Brantley Dep., Ex. D to Pl.'s Resp. to Board's Mot. for Summ. J., at 34:17-22; 35:6-7; 160:15-16 ("They're supposed to be right-hand man, to look after you and the road the way you would want to.").)  Brantley further described Jones's duties as "[h]e runs the road department, recommends purchases, needing equipment and takes commissioner's place when he's gone."  (Brantley Dep., Ex. A to Pl.'s Resp. to Brantley's Mot. for Summ. J., at 13:4-11.)

With respect to Jones's supervision, Brantley was Jones's direct supervisor and the only person to whom Jones reported.  Brantley and Hilton, another Osage County Commissioner, indicated that each commissioner generally runs his own district without interference from other commissioners.  (*See* Brantley Dep. 120:14-16 ("And each district pretty well runs their own.  I don't get involved in his [Hilton's] problems, and he [Hilton] would not have got involved in mine."); Hilton Dep. 26:19-20 ("That's usually how the commissioners do it, they usually take care of their own men and situations."); *id.* 106:23-25 (testifying that each commissioner has discretion as to how to discipline employees within his district).)  It is not, therefore, a situation in which Jones would occasionally be supervised by another county commissioner as part of his daily job functions.  Instead, Jones worked exclusively for and served at the discretion of Brantley.

With this job description in mind, the Court must determine whether the categories of speech identified by the Court were made by Jones as a citizen ("citizen speech") or pursuant to Jones's official duties ("official duty speech").  In making this determination, the Court closely examined the facts of *Garcetti* and post-*Garcetti* Tenth Circuit decisions.  In *Garcetti*, a deputy district attorney allegedly suffered a series of retaliatory employment

9

actions after he wrote a memorandum to his superiors. The memorandum explained his concerns regarding the inaccuracy of an affidavit that formed the basis of a search warrant and resulting criminal prosecution. The Ninth Circuit held the allegations of wrongdoing in the memorandum were protected speech, but the Supreme Court reversed. The Supreme Court held the memorandum was not protected speech because the memorandum was written pursuant to the attorney's "official duties," which included investigating charges brought by the office, exercising supervisory authority over other attorneys, and making recommendations as to the disposition of cases. *Garcetti*, 126 S. Ct. at 1955, 1959-60. Thus, the attorney "did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case" but instead "went to work and performed the tasks he was paid to perform." *Id.* at 1960. The Supreme Court contrasted the memorandum with instances in which a public employee clearly speaks as a citizen contributing to the public discourse, such as a letter to a newspaper. *See id.* ("Contrast, for example, the expressions made by the speaker in *Pickering*, whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day.").[7]

In *Casey v. West Las Vegas Independent School District*, 473 F.3d 1323 (10th Cir. 2007), the Tenth Circuit addressed whether three specific actions of a school superintendent qualified as citizen speech. First, the court held that the superintendent's reporting of

---

[7] It was undisputed in *Garcetti* that the attorney was acting pursuant to his official duties. *Id.* at 1961. The critical debate in *Garcetti* was whether speech made pursuant to official duties could, in any case, be protected by the First Amendment. *See id.* at 1959-62; *see also id.* at 1963 (Stevens, J., dissenting) ("The notion that there is a categorical difference between speaking as a citizen and speaking in the course of one's employment is quite wrong."). Thus, lower courts have been left to flesh out the distinction between citizen speech and official duty speech.

violations directly to the school board did not qualify as citizen speech because the superintendent's job included advising the school board "about the lawful and proper way to conduct school business."  *Id.* at 1329.  Second, the court held that speech by the superintendent's assistant (acting as the superintendent's agent) to federal authorities regarding problems with the district's Head Start program also did not qualify.  *Id.* at 1330.  Although the reporting was against the direct orders of the school board, the superintendent had a specific duty to report any noncompliance with Head Start requirements directly to federal authorities.  *Id.*  Thus, her actions were not "*ultra vires* conduct but rather an individual striving diligently to fulfill a federal regulatory obligation directly bearing on her by virtue of the office she held."  *Id.* at 1331.  On this point, the Tenth Circuit was careful to explain the limited nature of its holding:

> While we feel obliged after *Garcetti* to conclude that Ms. Casey's actions were taken pursuant to her official position, we do not mean to suggest that every agent who disregards a principal's instructions not to disclose information is barred from suit by *Garcetti*. To the contrary, we are confronted in this case with a rather narrower and subtler set of facts in which the plaintiff's job, as the chief overseer of Head Start for the District, included the sound administration of federal funds; federal law directed the disclosure of any irregularities in the use of such funds; the plaintiff conceded that her job duties required her to report to federal authorities; and she acted in a manner consistent with this admission.

*Id.*  Finally, the Tenth Circuit held the superintendent's reporting of the school board's failure to comply with the New Mexico Open Meetings Act to the New Mexico Attorney General did qualify as citizen speech because she "was not seeking to fulfill her responsibility of advising the Board when she went to the Attorney General's office.  Just the opposite: she had lost faith that the Board would listen to her advice so she took her grievance elsewhere."  *Id.* at 1332.

In *Green v. Board of County Commissioners*, 472 F.3d 794 (10th Cir. 2007), which was decided one month prior to *Casey*, the Tenth Circuit addressed whether the actions of a drug-lab technician at a juvenile detention center constituted citizen speech. The technician raised concerns with her superiors regarding the center's failure to have a confirmation drug testing policy, but they dismissed her concerns. Thereafter, the technician suspected a drug test yielded a false positive. Without consulting her supervisors, she arranged for a confirmation test with an outside hospital and subsequently suffered adverse employment actions. The court phrased the issue as whether the plaintiff's "activities in arranging for a drug confirmation test were pursuant to her duties as a drug lab technician." *Id.* at 798. The court reasoned that, on one hand, the action could be viewed as an activity undertaken in the course of her job because she had the responsibility for "collecting samples and testing them, and by extension, making sure the tests were as accurate as possible." *Id.* at 800. On the other hand, she was a lower-level employee and "was not required to improve the Center's system by advocating for a confirmation policy;" therefore, her activities could be viewed as "acting outside her day-to-day job responsibilities for the public good." *Id.* The court held her activities were not protected:

> Ms. Green was not communicating with newspapers or her legislators or performing some similar activity afforded citizens; rather, even if not explicitly required as part of her day-to-day job responsibilities, her activities stemmed from and were the type of activities that she was paid to do. Particularly, it was part of her job to ensure that the testing machines were working correctly, and it was part of her job to interact with her supervisors, clients, and third parties regarding testing policies and issues. Her disagreement with her supervisors' evaluation of the need for a formal testing policy, and her unauthorized obtaining of the confirmation test to prove her point, inescapably invoke *Garcetti*'s admonishment that government employee's First Amendment rights do not invest them with a right to perform their jobs however they see fit.

12

*Id.* at 800-01 (quotation omitted).

In the most recent Tenth Circuit decision, *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192 (10th Cir. 2007)*,* the court addressed whether teachers' complaints, which were aired to the school board, citizens, and parents, constituted citizen speech.  The court held that the majority of the complaints related to their duties as teachers and therefore did not qualify.  *Id.* at 1199, 1204, n.6.  The court held, however, that twelve specific matters did qualify because the teachers "had no supervisory responsibility and no duty to report with regard to [such matters], nor does it appear that [the teachers'] discussion of these matters occurred during the performance of their official duties because the discussion occurred after hours and outside of the [school]" and "included ordinary citizens and parents who were not employed by the [school]." *Id.*

These Tenth Circuit cases demonstrate that each communication must be separately scrutinized and that subtle factual differences can distinguish citizen speech from official duty speech.  With these principles in mind, the Court turns to the categories of speech at issue in this case.

a.     *Corbin Communications*

Corbin is employed by the State Auditor's Office, the entity responsible for investigation of county officials and the entity that eventually performed the investigation of Brantley as set forth in the Audit Report.  In the summer of 2004, Jones had an hour-long conversation with Corbin regarding Jones's "concern over some of the things that been and was occurring in the county road department."  (Corbin Dep. 30:16-20.)  The conversation occurred in the evening outside of Corbin's home.  Corbin recalls Jones reporting the following concerns during the 2004 conversation:

> [A] project at Nalgoney on dirt work with Bellco[8] and about the amount of
> quantities not being correct.  And contract being awarded without a bid,
> numbers being rounded off rather than detailed as far as quantity numbers or
> dollar amounts.  Various other activities, such as paving church parking lots,
> paving private property roads, ranch roads.  Installation of fence around . .
> . some kind of tower.  Installation of culverts.  That's – oh, use of equipment
> in the road department at the fairgrounds.
> . . .
> Then on the quantities, like Hudson Lake Road, where there was no contract
> for paving a road so they doubled up on the quantities of just purchasing
> asphalt in order to reimburse Bellco for installing the asphalt on the road.

(*Id.* 31:1-12, 33:12-15 (footnote added).)  Jones reported these matters to Corbin because

Corbin worked for the State Auditor's Office and because Jones "wanted to know if anything

could be done about it."  (*Id.* 34:2-7.)  Following this conversation, Corbin informed Jones

that he could not report Jones's concerns because Corbin was previously employed with

Osage County.[9]  However, Corbin offered to put Jones in contact with the proper individuals

in the Oklahoma City division of the State Auditor's Office.  (*Id.* 34:9-15.)  Corbin warned

Jones that once Jones came forward with this information, Jones could suffer adverse

employment action.

Jones's communication with Corbin regarding alleged instances of misconduct by

Brantley clearly constitute "citizen" speech made to promote the public's interest and not

in furtherance of his official duties.  The conversation was a report to a member of the

governmental body charged with investigating misconduct of county officials.  It occurred

at Corbin's home during the evening hours, rather than during Jones's work day.  In

---

[8]  Bellco is a company owned by an individual named Mike Bell of whom
Brantley was allegedly "too trusting."  (*See* Pl.'s Resp. to Board's Mot. for Summ. J. at
Additional Material Fact No. 23.)

[9]  Corbin formerly served as a first deputy in Osage County.

14

speaking to Corbin, Jones sought to expose Brantley's misconduct and went behind Brantley's back to do so.   Based on Jones's job description as First Deputy, he had no official responsibility to make such a report to an outside investigative agency regarding the misconduct of his commissioner.  Jones supervised subordinate District 1 employees but was not responsible for ensuring Brantley's compliance with ethical and legal responsibilities. Further, there is no evidence in this record, or any provision in the Oklahoma Statutes, stating that first deputies have an overarching obligation to the county that overrides their duty to serve their specific commissioner.  *See Brammer-Hoelter*, 492 F.3d at 1205 (holding that speech was "citizen" speech so long as teachers "had no supervisory responsibility or duty to report with regard to any of the problems being discussed").   Accordingly, the Court concludes Jones was not acting pursuant to his official duties in conversing with Corbin. Instead, Jones was acting "ultra vires" because reporting to Corbin was not done in the course of performing an official duty and because the speech did not reasonably contribute to or facilitate Jones's performance of his official duties.  *See Brammer-Hoelter*, 492 F.3d at 1204; *see also Casey*, 473 F.3d at 1330-31 (distinguishing between acting ultra vires and acting pursuant to official duties).[10]

b.      *Walker Communications*

Walker is the Director of the Osage Nation Transportation Improvement Program. Jones had one or more conversations with Walker during which Jones complained about

---

[10]   Although the subject matter of the speech undoubtedly involved Jones's employment, this is not dispositive.  *See Brammer-Hoelter*, 492 F.3d at 1204 ("Nor is all speech about the subject matter of an employee's work necessarily made pursuant to the employee's official duties.").   In fact, the Supreme Court "has acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion."  *Garcetti*, 126 S. Ct. at 1958.

Brantley's conduct.  According to Walker, Jones discussed with him "over 50 or up to 75 percent" of the issues that were eventually addressed in the Audit Report.  (Walker Dep. 25:12-16.)  Among other things, Jones informed Walker of (1) Brantley using Osage land for grazing his own cattle; (2) Brantley using "interest off of Indian reservations roads funds to overlay Boulanerville Road;" (3) Brantley "using certain county equipment at the fairgrounds that [Jones] perceived to be illegal;" (4) Brantley's "relationship with Bellco" and "leasing land off of Bellco considering Bellco is the biggest vendor for Osage County;" and (5) concern about what the county paid for a small stretch of road known as Naloganey Road.  (*Id.* 26-30.)

For the same reasons explained above with respect to the Corbin communications, the Walker communications constitute citizen speech.  The primary difference between the Corbin and Walker communications is that Walker is not a member of an investigative body charged with investigating county officials.  However, there is no requirement that the allegedly protected communication be made to an official entity charged with investigating misconduct.  *See Brammer-Hoelter*, 492 F.3d at 1205 (holding that teachers' speech at meetings involving "ordinary citizens and parents" was protected).  Further, Jones was reporting perceived misuse of Indian land and funds to the Director of the Osage Nation Transportation Improvement Program.  As with Corbin, Jones sought to expose Brantley's alleged misconduct to an interested member of the public, and there is no evidence that Jones had these communications pursuant to his official duties as First Deputy.[11]  Thus, although

_____

[11]  Walker testified that he did not recall specific times or places of the conversations.  Instead, these five topics were things Jones would "bring up from time to time" when he saw Walker.  (*Id.* 46:5-10.)  Thus, there is no evidence that these conversations occurred at work, during working hours, or in relation to Jones's

the conversations involved matters that related to the subject matter of Jones's employment, Jones's action of reporting such matter to Walker did not contribute to or facilitate the performance of any of his official duties.

c.      *Hilton Communications*

Hilton is the District 2 County Commissioner for Osage County.  Jones listed the following as the subjects of his reports to Hilton:

> Osage County potentially losing its certification from the drug testing company; my concern and disagreement with Brantley hiring back employees who had failed drug tests; improper use of County employees and equipment to grade private roads; improper use of County employees, equipment, and trustees at the fairgrounds for the Cattlemen's Convention; the issues surrounding Nelagony Road; and double billing by Bellco for work at Hudson Lake.

(*Id.*)[12]  These communications with Hilton occurred during phone conversations, outside the courthouse prior to meetings of the Board, and, on one occasion, at Charlie's Chicken restaurant.  The Hilton communications pose a more difficult inquiry than the Corbin or Walker communications.  Unlike Walker and Corbin, Hilton is a member of the Board and, like Jones, is a county government official.  The reports from Jones to Hilton are internal in that they are from one Osage County government official to another, rather than to a member of an external investigative body (such as Corbin) or a potentially harmed member of the public (such as Walker).  This makes it more likely that communications with Hilton were pursuant to Jones's official duties.

---

employment.

   [12]  Hilton's deposition testimony confirms that Jones made such reports on various occasions.

17

As an initial matter, the Court concludes this is not a situation, such as that presented in *Casey*, wherein any and all communications between Jones and Hilton are unprotected based solely on Jones's job description. *See Casey*, 473 F.3d at 1329 (holding that all statements to the school board were not citizen speech as a matter of law because the superintendent's job description included reporting to and advising the school board of the proper way to conduct school business). As explained above, each district in Osage County functions as its own separate entity. As a general rule, Hilton has no duty to supervise Jones, and Jones has no corresponding obligation to report concerns or problems to Hilton. In these circumstances, the Court cannot conclude that any and all communications to Hilton were made pursuant to Jones's official duties. Instead, the Hilton communications, like all others, require specific analysis.

### 1.    Phone Conversation

While Brantley was out of town, Jones received a phone call from the county's drug-testing provider informing him that the county was at risk of losing its drug-testing certification because it improperly rehired employees who had failed drug tests. During working hours, Jones reported this problem to Hilton by telephone. Jones called Hilton instead of Brantley only because Brantley was out of town. (*See* Jones Aff., ¶ 6 ("At the time, Brantley was out of town so I called Commissioner Hilton to report the problem.").) During this conversation, Jones informed Hilton that Jones disagreed with Brantley's decision to rehire two employees that had failed their drug tests, one of whom was Brantley's ex-girlfriend's son. (*See* Hilton Dep. 27:7-15 ("He was just saying that [Brantley] was out of line by hiring these guys back because they flunked a drug test.").) The Court finds that this conversation "stemmed from" and was the type of activity Jones was paid to

18

do as First Deputy.  *See Green*, 472 F.3d at 800-01.  The statements were made during working hours in the course of explaining a work-related problem.  Jones admitted he had this conversation with Hilton because Brantley was out of town, indicating that, in this particular instance, he was reporting to Hilton as someone above him in the county's chain-of-command and was carrying out the daily functions of his job.  Any reporting of Brantley's improper conduct during this phone conversation was done by Jones as a government employee rather than a citizen. *See Brammer-Hoelter*, 492 F.3d at 1204 ("The ultimate question is whether the employee speaks as a citizen or instead as a government employee - an individual acting in his or her professional capacity.").

2.     <u>Courthouse Conversations</u>

Jones reported concerns regarding Brantley's conduct to Hilton on "several" occasions in the parking lot outside the Osage County courthouse, immediately prior to meetings of the Board.  (Jones Aff. ¶ 9.)  Hilton described these instances of reporting as follows:

> He would, he would be at the courthouse working or something, of course we meet every Monday morning at the courthouse, and by the time I'd parked my car to get to the courthouse he would usually be in the parking lot for a little old three or five minute conversations, because I was always in a hurry to get in the courthouse and he would come by and say something to me about Commissioner Brantley, you know, oh, maybe using trustees for something, or he motor graded, graded that road or something, thought might be a little iffy call.

(Hilton Dep. 30:3-12.)

The courthouse conversations present a close question.  On one hand, the conversations occurred during working hours and were "internal" reports from one county official to another regarding subject matters related to Jones's employment, such as improper

19

use of county funds to pave private roads and use of inmate trustees on county property. Jones had knowledge of this information because of his employment as First Deputy.  On the other hand, unlike the phone conversation described above, the conversations did not occur in a typical workplace context.  Instead, they occurred quickly and at a somewhat private location, indicating they were more like citizen reporting to another county commissioner and less like official reporting to a superior.  In addition, in Osage County, it is not generally part of a first deputy's job description to report instances of misconduct by their own commissioner to other county commissioners.   Tom Teel ("Teel"), First Deputy for District 2 under Hilton, testified that, if he had a complaint about Hilton, he would take his complaint directly to Hilton or wait for the next election but would not take his complaint to Brantley or another commissioner.  (*See* Teel Dep. 13:2-13.)   Hilton testified that, as long as a complaint did not involve specific "self-dealing" by another commissioner, he would generally not get involved with it.  (Hilton Dep. 45:3-12.)

The Court concludes the courthouse conversations between Hilton and Jones were more akin to "an ordinary citizen speaking on his or her own time" than to an employee acting pursuant to his official duty to report to another commissioner. *See id.* at 1331.  These conversations were not something Jones was "paid to do" in his capacity as Brantley's First Deputy because Jones's primary duty was, according to Brantley, to serve as his right-hand man.  Further, there is nothing in the record indicating that Jones and Hilton discussed any topic other than instances of what Jones perceived to be improper conduct by Brantley.  If Jones was specifically accountable to and ultimately served all members of the Board, rather than Brantley, the outcome may be different.  *See Casey*, 473 F.3d at 1332 (finding that speech was precluded by *Garcetti* because superintendent had duty to report to school board,

"much as any corporate CEO might to his or her board of directors").  However, the record indicates that neither Jones nor Hilton considered this reporting to be in furtherance of Jones's official job functions.[13]

### 3. Charlie's Chicken Meeting

On one occasion, Jones had "a lunch meeting at Charlie's Chicken in Skiatook with Hilton and his first deputy Tom Teel, to discuss [his] concerns and complaints about Brantley's illegal conduct."  (Jones Aff. ¶ 13.)  At that meeting, they "discussed several issues, including the Nelogany Road project and the Hudson Lake project."  (*Id.*)  Thus, like the courthouse conversations, the meeting was during the work day and related to Jones's duties as First Deputy.  On the other hand, the meeting was scheduled for the purpose of reporting Brantley's misconduct and not for the purpose of conducting official county business.[14]  The Court finds no meaningful distinction between the courthouse conversations and the Charlie's Chicken meeting.  Although both occurred during working hours, neither can be characterized as in furtherance of Jones's official duties.  For the same reasons explained above with respect to the courthouse conversations, reports of perceived

_____

[13]  The nature and context of the courthouse conversations also make them distinguishable from a situation in which an employee seeks to contribute to "the formation and execution of official policy."  *See Mills v. City of Evansville*, 452 F.3d 646, 648 (7th Cir. 2006) (holding that policewoman who expressed her disagreement with a proposed policy immediately following announcement of new policy spoke in her capacity as a public employee rather than as a citizen).  By reporting to Hilton in this manner, Jones was seeking to expose instances of improper conduct rather than contribute in any official way to county policy.

[14]  Teel testified that he did not recall the purpose of the meeting, and there is no testimony from Hilton in this regard.  Thus, the Court accepts Jones's contention that he scheduled the meeting for the purpose of reporting misconduct.

misconduct by Brantley during this meeting and were more akin to citizen speech than official duty speech.

d.   *Parks Communications*

Parks is Brantley's secretary of ten years.  The Parks communications consist of instances in which Jones asked Parks to make copies of certain purchase orders and told her he planned to submit them to the State Auditor's Office.  Parks testified: "Basically [Jones] asked for copies of the purchase orders connected with the Naloganey Road project and he asked for a couple of others but I don't remember what they were now . . . He said there was things wrong with the work that had been done and he wanted proof of it. . . . He told me he was going to take them to the auditors."  (Parks Dep. 26:5-27:4.)  Parks was aware that Jones believed something was "wrong" with the project.  (*Id.* at 27:9-12 ("I said I'll make you the copies but the paperwork is going to match.  You are going to have to find something else if you're going to prove there was something wrong.").)  These comments to Parks were made during the work day and in the primary office for District 1.

Again, the Parks communications present a close question.  On one hand, Jones was acting outside his assigned work duties as First Deputy for Commissioner Brantley because he was conducting an investigation of Brantley's conduct for purposes of submission to the State Auditor's Office.  Therefore, in speaking to Parks, Jones was arguably not "engag[ing] in speech during the course of performing an official duty."  *See Brammer-Hoelter*, 492 F.3d at 1203.  As with the Hilton courthouse conversations and Charlie's Chicken meeting, Jones was in fact acting contrary to his responsibilities to serve as Brantley's "right-hand man."  On the other hand, unlike the protected Hilton conversations, the conversation took place in a typical workplace setting – the District 1 office.

22

The Court finds the Parks communications to be more like the protected courthouse conversations and Charlie's Chicken meeting with Hilton.  Although Jones was speaking to a subordinate employee in the District 1 office, he was doing so for a purpose that was unrelated to his official job responsibilities.  This was not a routine request for paperwork that Jones would complete as part of his daily job functions; it was an investigation into his supervisor's conduct when such investigation was not part of his official duties.  Considering all circumstances, the Court finds these investigative actions and communications to Parks were more like a "citizen speaking on his or her own time" than an employee completing his official job functions.  *See Casey*, 473 F.3d at 1331.  Jones's investigative motive was wholly inconsistent with his official duty to run the road department under Brantley's command.  Accordingly, the Parks communications are protected citizen speech.

e.    *Parsons Communications*

According to Parsons, who was a purchasing agent for Osage County at relevant times, she had "a number of conversations with Mr. Jones regarding County Commissioner Clarence Brantley's wrongdoing and illegal activities, and Mr. Jones' intention to expose such matters." (Parsons Decl. ¶ 4.)  Subsequent to these conversations, Jones requested that Parsons make him copies of certain purchase orders that had been requested by Brantley.  For the same reasons explained above with respect to the Parks communications, the Court finds these conversations with Parsons constitute citizen speech.  In discussing Brantley's conduct and asking Parsons to make copies of purchase orders in an attempt to gather incriminating evidence against Brantley, Jones was not acting pursuant to his official duties but was instead acting as a concerned citizen.

f.    *Hudson communications*

23

The evidence in the record regarding the Hudson communications is Jones's statement that he made Brantley's activity known to her (Jones Aff. ¶ 11), and Parsons' statement that she "witnessed [Jones] go into [Hudson's] office on several occasions to discuss Clarence Brantley's activities" (Parsons Decl. ¶ 6).[15] For the same reasons explained above with respect to the Parks and Parsons communications, the Court finds that the Hudson communications, assuming they did occur and that they related to illegal activities as indicated by Parsons, constitute citizen speech. By whistleblowing on Brantley to Hudson, Jones was not acting pursuant to his official duties but was instead acting as a concerned citizen.

g.      *Other communications*

Jones alleges that he "made Brantley's activity know[n] to numerous people including: . . . Bob Jackson . . . and Assistant District Attorney Tommy Humphries;" that he had discussions about Brantley with "County officials and employees, as well as the general public," and that he had certain discussions at a seminar with some commissioners. (Jones Aff. ¶¶ 11-12.) These allegations are not supported with significant detail or with testimony from the recipients or any other individuals. It is therefore impossible for the Court to analyze the subject matter, nature, time, location, or context of these communications to determine if the speech was made pursuant to Jones's official duties or as a citizen. In this situation, it appears the proper course is to deny protection of such communications rather

---

[15] As explained below, some of Jones's alleged instances of protected speech are not sufficiently developed to survive summary judgment. However, because of the supporting statement provided by Parsons in addition to Jones's Affidavit, which provides some context for the Hudson communications, the Court finds the evidence sufficient to evaluate the status of the Hudson communications as citizen speech or official duty speech.

than allow Jones to present additional evidence at trial.  *See Deschenie*, 473 F.3d at 1277 n.5 (explaining, and implicitly approving, district court's denial of protection for certain instances of speech at summary judgment stage "because they were too 'amorphous' to allow a proper analysis of the content, context, and form").

2.    Public Concern

The categories of speech that survive the first step of the *Pickering/Garcetti* analysis are the (1) Corbin communications, (2) Walker communications, (3) Hilton communications occurring outside the courthouse and at Charlie's Chicken; (4) Parks communications, (5) Parsons communications, and (6) Hudson communications.  The Court must now analyze whether such communications relate to a matter of "public concern."  The Tenth Circuit recently defined this element:

> Matters of public concern are those of interest to the community, whether for social, political, or other reasons.  In determining whether speech pertains to a matter of public concern, the court may consider the motive of the speaker and *whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the public's interest. Statements revealing official impropriety usually involve matters of public concern.*  Conversely, speech that simply airs grievances of a purely personal nature typically does not involve matters of public concern.  In deciding what is a matter of public concern, we are required to consider the content, form, and context of a given statement, as revealed by the whole record.

*Brammer-Hoelter*, 493 F.3d at 1205 (emphasis added).  In this case, the above-described conversations with Corbin, Walker, Hilton, and Hudson were for the express purpose of exposing Brantley's alleged improper conduct as a county commissioner, which is of extreme interest to the citizens of Osage County.  Similarly, the conversations and interactions with Parks and Parsons were for the purpose of gathering incriminating evidence against Brantley.  All such instances survive the second element because Jones's speech and

actions were "calculated to disclose misconduct" by Brantley and were not merely to air a personal dispute or grievance unrelated to the public's interest. *See id.*; *see also Lee v. Nichol*, 197 F.3d 1291, 1295 (10th Cir. 1999) ("Speech that calls attention to a government's failure to discharge its governmental duties generally constitutes a matter of public concern."); *Prager v. LaFaver*, 180 F.3d 1185, 1190 (10th Cir.1999) ("Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of public officials, in terms of content, clearly concerns matters of public import.") (quotation omitted); *McFall v. Bednar* 407 F.3d 1081, 1089 (10th Cir. 2005) ("A government employee's speech that seeks to expose improper operations of the government or questions the integrity of government officials clearly concerns vital public interests.") (quotations omitted).

3.   Balancing of Interests

At this step, a court must "balance the employee's First Amendment speech against an employer's interest in an efficient and disciplined work environment." *Brammer-Hoelter*, 492 F.3d at 1207.  A court must arrive at a balance between the interests of the employee as a citizen in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. *See Casey*, 473 F.3d at 1327.  The Tenth Circuit has described the balancing prong as "a matter of great debate and little certainty," s*ee id.* at 1328 (citing law review articles explaining uncertainty produced by balancing analysis), but has provided courts with the following guidance:

> [T]he question is whether the employer has an efficiency interest which would justify it in restricting the particular speech at issue.  In performing the balancing, the statement will not be considered in a vacuum; *the manner,*

*time, and place of the employee's expression are relevant, as is the context in which the dispute arose.*  Pertinent considerations include whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.  Arguably, the only public employer interest that can outweigh a public employee's recognized speech rights is the interest in avoiding direct disruption, by the speech itself, of the public employer's internal operations and employment relationships.

*See Brammer-Hoelter*, 492 F.3d at 1207 (internal quotations and citations omitted) (emphasis added).  As to the balancing step, the employer bears the burden of proof and must present evidence "justifying its regulation" of the employee's speech.  *See id.* (reversing district court's grant of summary judgment to employer premised on employee's failure to present sufficient evidence to prove that his interest in speaking outweighed the employer's interest in avoiding disruption); *Casey*, 473 F.3d at 1333 (affirming denial of summary judgment as to this element and stating issue as whether "the defendants have amassed evidence" that the employee's "activities were sufficiently disruptive to eliminate the First Amendment's protection of her speech").

In this case, Brantley requests the Court to find as a matter of law that Brantley's termination decision was justified based on the disruption the speech caused to Jones's and Brantley's working relationship and the road crew's work performance.  However, the Court has identified questions of fact that must be resolved before the Court can properly conduct a balancing analysis, and the Court will exercise its discretion to have these facts resolved by a jury.[16]

---

[16]  In *Weaver v. Chavez*, 458 F.3d 1096, 1100-01 (10th Cir. 2006), the Tenth Circuit explained the "relative role of the trial court and the jury in determining the balancing of interests required at step [three]."  After explaining a circuit split regarding

First, there is a dispute as to the content of the speech that formed the basis of the termination.  Brantley has not admitted that he terminated Jones based on speech found to be protected by the Court.  Instead, Brantley only conceded awareness that Jones was generally "bad-mouthing" him.  (*See* Brantley Dep. 21:25-22:6 ("And later on people were telling me that he was bad-mouthing me in town.  Some of the crew members was telling me he was bad-mouthing me.").)[17]  Brantley denied being aware of exactly what Jones said about him, *i.e.*, that he was engaging in improper conduct as a county official.  Therefore, Brantley has attempted to justify the termination based on "workplace disruption" caused by Jones's "bad-mouthing" while at the same time deny knowledge of the *specifics* of the bad-mouthing.  Jones will contend at trial that Brantley knew the subjects of the bad-mouthing, *i.e.*, the protected speech regarding improper conduct, and that this formed the basis of the termination decision.[18]  Although Brantley urges the Court to balance the "bad-mouthing" as the relevant speech, this ignores the factual question raised by the evidence. Therefore, the Court finds it necessary to have a jury determination of the relevant speech

---

whether it was proper to submit questions to the jury regarding the balancing prong, the Tenth Circuit concluded that "the decision to submit questions of fact to the jury is within the sound discretion of the district court."  *Id.* at 1102.  The court explained that "[w]hile the court must ultimately undertake the *Pickering/Connick* analysis itself - (1) the manner, time, and place of the speech, (2) the context of the speech, and the (3) the effect of any disruption caused by the speech - many of these inquiries may be fact-intensive." *Id.*

[17]  Brantley allegedly learned of the bad-mouthing through "coffee shop talk" and because two road crew employees informed him of said communications.  (*See id.* 29:21-30:8.)  Brantley took "bad-mouthing" to mean that Jones was "running [him] down" and "trying to discredit [him] with the public."  (*Id.* at 32:1-4.)

[18]  As explained in more detail as to the fourth element, Jones has presented sufficient evidence to reach a jury on this question.

that was a substantial motivating factor in the termination decision before it can weigh the speech against workplace disruption. *Cf. Waters v. Churchill*, 511 U.S. 661, 681 (1994) (plurality opinion) (finding that jury must decide what speech was a motivating factor for the termination in order for the district court to properly perform balancing test); *Weaver*, 458 F.3d at 1098 (implicitly approving district court's procedure whereby district court went to trial on two specific instances of speech – support of a mayoral candidate and criticism of hiring practices – as potential bases for termination but granted judgment as a matter of law at close of evidence as to one potential basis); *Lunsford v. Bd. of County Comm'rs*, No. 05-CV-218-CVE, 2006 WL 2679578, at * 5 (Sept. 18, 2006) (N.D. Okla. 2006) (delaying balancing test until after jury's determination of whether political campaign involvement was actual reason for termination).

Second, the Court finds questions of fact regarding whether the speech that formed the basis of the termination decision caused disruption to Jones and Brantley's working relationship or to the road crew. Brantley has alleged that he "lost faith" in Jones and identified a few isolated performance problems as evidence, all of which are denied by Jones. Brantley has also alleged that two members of the road crew came to him regarding the bad-mouthing, evidencing disruption of the road crew. However, neither instance of reporting by road crew members was in the context of a work-related problem. At the very least, there is a question of fact regarding the existence and/or extent of workplace disruption caused by Jones's public criticism of Brantley. Accordingly, Brantley is not entitled to a finding that the termination was justified based on workplace disruption at this stage of the proceeding. *See Weaver*, 458 F.3d at 1098 (approving district court's submission, by special verdict, the question of whether the speech that formed the basis of the termination caused

disharmony or disruption in the workplace).  Instead, the Court finds it proper to delay the balancing test following a jury's determination of what, if any, protected speech formed the basis of the employment decision and whether this speech disrupted the workplace.

4.    Substantial Motivating Factor

With respect to the fourth element, an employee "must show that his speech was a substantial factor or a motivating factor in [a] detrimental employment decision." *Brammer-Hoelter*, 492 F.3d at 1203.  To meet this burden at the summary judgment stage, an employee must establish genuine issues of material fact as to whether his protected speech substantially motivated the adverse employment action. *See Deschenie*, 473 F.3d at 1277. A plaintiff must present some evidence "linking the employer's action to the employee's speech." *See Maestas v. Segura*, 416 F.3d 1182, 1188 (10th Cir. 2005).  Unlike the first three steps, which are questions of law for the court, the fourth step is ordinarily resolved by the trier of fact. *See Brammer-Hoelter*, 492 F.3d at 1203.

The Court finds that Jones has demonstrated a question of fact as to whether protected speech was a motivating factor in Brantley's decision to terminate Jones.  As the reason for the termination, Brantley testified that he "had lost all faith in [Jones] as a – as a person to represent me and be my right-hand man."  (Brantley Dep. 35:6-7.)  However, at the time Brantley allegedly "lost faith" in Jones, Brantley was admittedly aware that Jones was "bad-mouthing" him and trying to "discredit him" with the public.  Although Brantley denies knowing of any specific instances of protected speech or the specific subjects of the bad-mouthing, a jury could conclude otherwise.  Therefore, the Court finds Brantley's own testimony sufficient to raise an inference of retaliatory motive.  In addition, there is evidence that could lead a jury to conclude Brantley was aware of whistleblowing by Jones to Hudson

at the time of the termination decision.  Specifically, Parsons declared that "[a] number of times soon after [Jones] had left [Hudson's] office [Brantley] would come and speak to [Hudson] in her office."  (Parsons Decl. ¶ 6.)  After one such meeting, Hudson told Parsons that she must report to Hudson if anyone requested copies of purchase orders.  (*Id.* ¶ 7.)  This could lead a jury to conclude that Brantley was aware of protected speech and that such speech formed the basis of the termination decision.  In sum, there is sufficient evidence "linking the employer's action to the employee's speech," such that Jones is entitled to a jury determination on this question.  *See Maestas*, 416 F.3d at 1188.[19]

For reasons explained above, the Court concludes that Jones engaged in protected speech on matters of public concern, that Brantley has not, at this stage of the proceedings, justified the termination based on workplace disruption, and that Jones has created a question of fact as to whether protected speech was a motivating factor in his termination.  Therefore, for purposes of the first prong of the qualified immunity test, Jones has demonstrated that a constitutional right was potentially violated.  *See Casey*, 473 F.3d at 1333.

B.      Clearly Established Right

The court must next examine whether the constitutional right was clearly established in law on or before January 6, 2005, the date of the alleged termination, such that a reasonable official would be aware his conduct violated such right.  *See Casey*, 473 F.3d at 1333 (for purposes of qualified immunity analysis, inquiring "whether the right [the employee] asserts was clearly established in law such that it put defendants on notice of the

---

[19]  The parties have not addressed, and the Court does not reach, the fifth question of whether the employer "would have taken the same action against the employee even in the absence of the protected speech."  *See Brammer-Hoelter*, 492 F.3d at 1203.

impropriety of their alleged retaliation").  As a general matter, there can be no question that the right at issue – a public employee's right to speak out on a matter of public concern – was clearly established at the time of Jones's termination.  *See Casey*, 473 F.3d at 1333 ("It has long been established law in this circuit that when a public employee speaks as a citizen on matters of public concern to outside entities despite the absence of any job-related reason to do so, the employer may not take retaliatory action."); *McFall*, 407 F.3d at 1090 (holding that the defendant in that case "or any other reasonable official" would "understand that firing an employee for exercising her free speech rights violated clearly established law and that such a termination was actionable under 42 U.S.C. § 1983").

Brantley argues, however, that the right was not clearly established in this case because Brantley had reason to believe the balancing prong weighed in his favor.  (*See* Brantley's Mot. for Summ. J. 24-25 ("Given the deterioration in the relationship between Plaintiff and Brantley and its effect on the efficiency of the Commissioner's staff and office, and that it is permissible to terminate a position that requires a close personal relationship or loyalty . . . Brantley could not have known that terminating Plaintiff violated his rights.").  First, it is not clear that the Tenth Circuit requires an employee to demonstrate this level of specificity in prior case law in order to prove that his right to engage in protected speech was "clearly established."  *See McFall*, 407 F.3d at 1090 (holding that the defendant in that case would "understand that firing an employee for exercising her free speech rights violated clearly established law" without specific analysis of factual scenario presented).  Second, this Court has found questions of fact as to whether the balancing prong actually weighs in Brantley's favor and has exercised its discretion to submit certain questions to the jury before completing its analysis.  Therefore, qualified immunity must also be denied at the

summary judgment stage.  *See* Note, Anne Gasperini DeMarco, *The Qualified Immunity Quagmire in Public Employees' Section 1983 Free Speech Cases*, 25 Rev. Litig. 349, 351 (2006) ("DeMarco") (explaining that, in circuits that allow factual questions on the balancing prong to reach a jury, "courts do not confront the qualified immunity issue until a jury has decided the facts underlying the *Pickering* test").[20]   Brantley's motion for summary judgment based on qualified immunity is DENIED.

## IV.    Section 1983 Claim - Defendant Board

Board's only argument in support of summary judgment is that Brantley did not commit any constitutional violation.  (*See* Board's Mot. for Summ. J. 8-9.)  The Court has rejected this argument, and Board is not entitled to summary judgment on this basis.

In his response brief, Jones urged the Court to hold that Brantley acted as a "final policymaker" with respect to the decision to terminate Jones, such that Board is liable for Brantley's actions as a matter of law.   A municipality may be held liable for an unconstitutional action of a municipal employee if the actions were "representative of an official policy or custom of the municipal institution, *or were carried out by an official with final policy making authority with respect to the challenged action.*"  *See Camfield v. City of Okla. City*, 248 F.3d 1214, 1228 (10th Cir. 2001) (quotations omitted) (emphasis added); *Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995) (explaining that decision of official who possesses final policymaking authority in a certain area constitutes municipal

---

[20]   The question of the existence of a "clearly established right" presents a difficult question in the context of First Amendment retaliation.  *See supra* DeMarco, (exploring "ways in which federal courts gave tried to reconcile the fact-specific *Pickering* balancing test . . . with the 'clearly established law' requirement of the qualified immunity doctrine").

policy for § 1983 purposes).  An individual can become a final policymaker either by an explicit statutory directive or by delegation from the final policymaker.  *See Hollingsworth v. Hill*, 110 F.3d 733, 743 (10th Cir. 1997).  Where there is no clear statutory directive, three factors can help identify whether an individual is a final policymaker as to a particular decision: "(1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decision are final - *i.e.*, are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority."  *Randle*, 69 F.3d at 448 (quotation omitted).  "Whether an individual possesses final policymaking authority is a legal issue to be determined by the court based on state and local law."  *See Hollingsworth*, 110 F.3d at 743.

The Court concludes that Brantley, as the District 1 County Commissioner, was a final policymaker with respect to Jones's termination because the Board delegated the authority to make all District 1 personnel decisions to Brantley.  (Employee Personnel Policy Handbook Osage County ("Handbook"), Ex. 6 to Board's Reply to Mot. for Summ. J. ("Employees serve at the pleasure of the elected official.").)  As to the first and third factors, Brantley clearly had the authority to make the termination decision at issue and was not constrained by any policy "not of his own making" in terminating Jones.  The record indicates that each commissioner was delegated the authority to make hiring and firing decisions for his district and that Brantley made the decision to terminate Jones on his own, without consulting Board or anyone else.  (Brantley Dep. 120.)  As to the second factor, Jones had no avenue for meaningful review of Brantley's decision, and Brantley's decision was considered final by Jones and other members of the Board.  (*See* Hilton Dep. 109-10.)

34

This case is similar to *Starrett v. Wadley*, 876 F.2d 808, 818-19 (10th Cir. 1989), wherein an Oklahoma County Assessor was found to be a final policymaker with respect to a personnel decision because the assessor "could not have fired plaintiff except for the fact that the County vested him with that authority, and [the assessor] was acting in his official capacity for the County when he performed the act." Accordingly, in the event Brantley is found to have committed a constitutional violation, the Board is liable for such violation as a matter of law.[21]

## V. Termination in Violation of Public Policy

The Oklahoma Supreme Court "recognize[s] a cause of action for wrongful discharge in violation of public policy, creating an exception to its general rule of at-will employment." *Wilburn v. Mid-South Health Dev't, Inc.*, 343 F.3d 1274, 1277 (10th Cir. 2003) (citing *Burk v. K-Mart*, 770 P.2d 24 (Okla. 1989)). This cause of action is known as a *Burk* tort. The *Burk* tort is "tightly circumscribed" and is available only when "an employee is discharged for refusing to act in violation of an established and well-defined public policy or for performing an act consistent with a clear and compelling public policy." *Id.* (quotation omitted). "The clear and compelling public policy on which the plaintiff relies must be articulated by state constitutional, statutory, regulatory or decisional law." *Id.* Board made three arguments in support of summary judgment as to Jones's *Burk* claim: (1) Jones may not assert a *Burk* tort because he is a "public officer" who is not entitled to

---

[21] In its reply, Board made no attempt to refute Jones's factual averments or counter Jones's argument regarding municipal liability. In fact, Board expressly argued, for purposes of the breach of contract claim, that "each District operates differently on its discipline and [such discipline] is completely discretionary to the Commissioner." (Board's Reply in Support of Mot. for Summ. J. 3.)

contractual remedies; (2) Jones may not assert a *Burk* tort because he has an adequate statutory remedy; and (3) Jones has failed to identify a public policy that supports his claim.

A.  Public Officer

Board first argued that Jones, as First Deputy, is a "public officer" rather an "employee" of the county, that he does not have an employment relationship with the county, and that he is therefore not entitled to any contractual or quasi-contractual remedies such as a *Burk* claim.  This argument is contrary to statute, the evidence presented, and case law.  First, Oklahoma law defines county "officers" as including the county clerk, county commissioner, county assessor, district court clerk, county treasurer, and county sheriff. Okla. Stat. tit. 19, § 161(1).  The very same statute defines "deputy" as one or more "regular employees" appointed to assist a county officer.  *Id.* § 161(2).  Second, the Handbook for Osage County states that "[c]ounty employees are defined as *those deputies* and others employed by serving at the pleasure of the elected officials.  Each County employee is responsible to the elected official who hires and/or appoints that employee."  (*See* Board's Reply in Support of Mot. for Summ. J at Ex. 6 (emphasis added).)  Finally, case law also indicates that Jones is a county employee, rather than a public officer, because Jones served "at the will and pleasure" of Brantley and because Jones's duties could be changed at the will of Brantley.  *See Farley v. Bd. of Ed. of City of Perry*, 162 P. 797, 799 (Okla. 1917) ("When such appointment is provided for or required by law, which fixes their powers and duties, and they are required to take an oath and to give bonds, they are usually considered public officers; *but where a deputy is appointed, merely at the will and pleasure of his principal, to serve some purpose of the latter, he is not a public officer, but a mere servant or agent.* So a position the duties of which are undefined, and which can be changed at the

36

will of the superior, . . . is not an office, but a mere employment, and the incumbent is not

an officer, but a mere employé.") (emphasis added) (quotations and citations omitted).

Significantly, the Oklahoma Supreme Court used the word "deputy" to describe a person

who is not considered a public official. Therefore, assuming without deciding that a "public

officer" is never entitled to contract-based remedies for adverse employment actions, the

Court concludes Jones is not a "public officer" as defined by Oklahoma law.

B.     Adequate Statutory Remedy

Board also argued that Jones's *Burk* tort is precluded based on the "adequate

statutory remedy" doctrine, which states that a *Burk* claim is not available if a plaintiff has

an adequate statutory remedy. However, in a case presenting an identical scenario to that

presented here, the Tenth Circuit held that the "adequate statutory remedy" preclusion did

not apply to conduct-based, rather than status-based, terminations. *See Green v. Bd. of

County Comm'rs*, 472 F.3d 794, 804 (10th Cir. 2007). Specifically, the Tenth Circuit held

that a *Burk* claim was not precluded by the plaintiff's First Amendment retaliation claim

because "it appears that the Oklahoma Supreme Court would allow Ms. Green to pursue a

*Burk* claim, as her wrongful discharge allegations are predicated upon her conduct rather

than her status." *Id.* The Tenth Circuit acknowledged ambiguity in Oklahoma law regarding

whether the "adequate statutory remedy" doctrine applied to conduct-based terminations as

well as status-based terminations. *Id.* However, without further guidance from the

Oklahoma Supreme Court, the Tenth Circuit was "unwilling to ignore [the Oklahoma

Supreme Court's] specific references distinguishing between status-based and conduct-based

claims." *Id.* Although Board argued that *Green* was wrongly decided and urged this Court

to reach a contrary decision, the Court is bound to follow *Green*'s interpretation of

37

Oklahoma law. *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 867 (10th Cir. 2003) (holding that absent intervening change in state law, a district court is bound to follow circuit court's interpretation of ambiguous state law).

### C.        Clearly Established Public Policy

Board finally argued that Jones failed to identify a clearly established public policy underlying his claim.  Generally, Jones's claim is that his "whistleblowing" on Brantley's alleged illegal conduct invoked Oklahoma public policy because the state has a public policy in favor of avoiding corruption of county officials and preserving state resources.  Jones identified three potential sources for this public policy – (1) the case of *Vannerson v. Board of Regents*, 784 P.2d 1053 (Okla. 1989); (2) the Whistleblower Act, Okla. Stat. tit. 74, § 840-2.5; and (3) Article 2, § 22 of the Oklahoma Constitution.

The Oklahoma Supreme Court has held that "Oklahoma law protects both internal and external reporting of whistleblowers who establish a sufficient public policy violation from retaliatory discharge." *Barker v. State Ins. Fund*, 40 P.3d 463, 468 (Okla. 2001); *see also Wilburn v. Mid-South Health Dev't, Inc.*, 343 F.3d 1274, 1278 (10th Cir. 2003) (recognizing that "internal and external whistleblowers may state a *Burk* tort claim so long as they assert a "strong public policy supporting their specific whistleblowing activity" and the whistleblowing is not "based entirely on rumor").  As in *Barker*, the issue presented here is whether the subjects about which Jones complained are ones that "genuinely involve the mandates of public policy" or are "ordinary disputes between an employee and employer." *Id.* (quotations omitted).

The Court finds a clearly established public policy articulated in jurisprudential law that supports Jones's *Burk* claim.  In *Vannerson v. Board of Regents*, 784 P.2d 1053 (Okla.

1989), a university employee witnessed the transfer of two boxes of state-owned floor tiles to a non-employee, reported this transfer to the internal auditing department, and allegedly suffered a retaliatory termination.  The Oklahoma Supreme Court held that "if plaintiff was in fact discharged for going over his supervisor's head in complaint of an illegal disposition of state property then public policy is invoked."  *Id.* at 1055; *see also Barker v. State Ins. Fund*, 40 P.3d 463, 468-71 (Okla. 2001) (describing *Vannerson* as a "leading" case dealing with *Burk* torts premised on whistleblowing and explaining that reports of illegal disposition of state property implicates a clear and compelling state policy).  Viewed in their most favorable light, Jones's complaints involved, *inter alia*, misappropriation of county funds and misuse of county property by a high-ranking county official.  Jones alleged basis for such complaints is his first-hand observation while serving directly under such official.  Therefore, the subject matter of Jones's complaints implicate a compelling public policy, as recognized in *Vannerson*, against the wrongful transfer or use of government-owned property.[22]  Jones's reports were not based on rumor or speculation but were based on observations and investigation.  Accordingly, the Court finds the existence of a "sufficiently strong public policy underlying [Jones's] whistleblowing acticity," such that Jones can survive summary judgment.  *See Wilburn*, 343 F.3d at 1278.  Because the Court has found the relevant public policy to be articulated in decisional law, the Court declines to reach

---

[22]  Although county property is at issue, rather than state property, counties are mere subdivisions of the State.  *See Johnston v. Conner*, 236 P.2d 987, 989 (Okla. 1951) ("A county being an involuntary, subordinate political subdivision of the state, created to aid in the administration of governmental affairs of said state, and possessed of a portion of the sovereignty, has no inherent powers but derives those powers solely from the state.").  Therefore, this case is sufficiently similar to fall within the public policy goal identified in *Vannerson*.

whether the Whistleblower Act or the Oklahoma Constitution also provide support for Jones's claim.

## VI.     Breach of Contract Claim

Jones alleged Board breached an implied employment contract with Jones because Brantley failed to follow a policy of "incremental discipline."  Board made two arguments to defeat this claim: (1) Jones is a "public officer," rather than a county employee, and therefore is not entitled to any contractual remedies, and (2) assuming he is a contractual employee, Jones has not presented sufficient evidence to survive summary judgment as to the existence of an implied contract.  The Court has already rejected Board's first argument, *see supra* Part V.A, and will only address the second argument.

Oklahoma is an at-will employment state where an employer "can discharge an employee for any reason, in the absence of a contractual provision to the contrary." *Bowen v. Income Producing Mgmt. of Okla., Inc.*, 202 F.3d 1282, 1284 (10th Cir. 2000).   An employer can alter the at-will employment relationship by creating an implied contract with the employee regarding the reasons for which he can be terminated.  However, the promises must be definite.  *See Russell v. Bd. of County Comm'rs*, 952 P.2d 492, 502 (Okla. 1997) ("[I]n order to create an implied contract the promises must be definite.").  If the alleged promises forming the basis of an implied contract are nothing more than "vague assurances," the question of whether an implied contract was formed can be decided as a matter of law. *See Bowen*, 202 F.3d at 1284.  Employer guarantees are merely vague assurances unless they place "substantive restrictions" on the reasons an employer may terminate an employee.  *See id.*  In determining whether the parties intended to form a contract, courts are to balance five factors:  (1) evidence of separate consideration beyond the employee's services; (2) length

of employment; (3) employer handbooks and policy manuals; (4) detrimental reliance by the employee; and (5) promotions and commendations. *Id.*

In this case, the alleged basis for the implied contract is a promise that Brantley would follow an incremental discipline policy consisting of a verbal warning and a written warning prior to terminating Jones. Jones's evidence that this promise was made consists of the following: (1) Brantley's testimony that he set an incremental discipline policy for District 1 and required Jones to enforce such policy as to District 1 employees; (2) Corbin's testimony that, as a former First Deputy for District 1, he believed he would have been entitled to incremental discipline prior to termination; (3) Teel's testimony that, as First Deputy for District 2, he believed he was entitled to incremental discipline prior to termination; (4) Jones's testimony that he expected the incremental policy to apply to him; and (5) a signed acknowledgment by Jones that he would be terminated "immediately for fighting, mouthing, or agitating" (Pl.'s Resp. to Board's Mot. for Summ. J., at Ex. J), which, according to Jones, evidences that any other infraction was subject to incremental discipline. Notably absent from Jones's proof is any direct statement from Brantley to Jones or any written policy, such as that contained in a policy manual or handbook. As to other relevant factors, Jones presented undisputed evidence that he served the county for twenty-five years, had served as Brantley's First Deputy for eight years, and had received a pay raise nine months prior to his termination.

Board's evidence against the formation of an implied contract is (1) the absence of any written policy or any other indication that Brantley intended incremental discipline to be mandatory in every case; (2) a provision in the Employee Personnel Policy Handbook for Osage County, which states that "[e]mployees serve at the pleasure of the elected official;"

41

—

(3) Brantley's testimony that the incremental discipline applied to lower-level employees did not apply to the position of First Deputy; and (4) Parks's testimony that Brantley fired Floyd Kyler, the First Deputy employed prior to Jones, without any warning, evidencing that Brantley did not have a pattern or practice of promising First Deputies the benefit of incremental discipline.

At best, the record indicates nothing more than "vague assurances" that Jones was entitled to incremental discipline prior to termination.  The only written policy of the Board is that Jones served at the pleasure of Brantley.  This certainly does not evidence an implied contract guaranteeing Jones incremental discipline.  Instead, it is similar to a disclaimer of any promise of incremental discipline or other substantive restriction on the grounds for termination.   Jones's best evidence is that Brantley instructed Jones to enforce an incremental discipline policy with respect to Jones's subordinate employees.  However, even assuming this unwritten policy could give rise to an implied contract with such employees, there is no evidence that Brantley made such a promise to Jones or intended that such policy would apply to Jones.[23]  Further, Jones has failed to present evidence that Brantley had a "pattern" of applying incremental discipline to First Deputies.  *See Berry v. T-Mobile*, 490 F.3d 1211, 1223 (10th Cir. 2007) (applying Colorado law) (explaining that disciplinary policies will only give rise to implied contract if procedures were "always" used for employees within a plaintiff's department or at his level of management in the company).  In fact, Brantley terminated Floyd Kyler – the First Deputy who served immediately prior

---

[23]  Because each commissioner had discretion to set his own incremental discipline policies, the Court finds it irrelevant that Teel (who served Hilton) and Corbin (who served a different commissioner) believed first deputies were generally subject to incremental discipline.

42

to Jones – without any warning.  Without a specific promise from Board or Brantley, a written indication that the policy existed and specifically applied to Jones, or evidence that Brantley had a pattern and practice of applying incremental discipline to his first deputies, Plaintiff has not shown a promise sufficient to form an implied contract.[24]

Brantley's Motion for Summary Judgment (Doc. 34) is DENIED.  Board's Motion for Summary Judgment (Doc. 33) is DENIED as to Jones's First Amendment retaliation claim and *Burk* claim, and GRANTED as to Jones's breach of contract claim.  Jones's motion to supplement his summary judgment record with the Parsons Declaration (Doc. 82) is GRANTED.  The parties shall submit a revised Pretrial Order consistent with this Opinion and Order no later than March 3, 2008.

**ORDERED this 12th day of February 2008.**

**TERENCE KERN
UNITED STATES DISTRICT JUDGE**

---

[24]  Although two of the balancing factors weigh in favor of Jones – the lengthy nature of his employment with the county and the pay raise received within the year of his termination – these factors cannot outweigh the absence of a definite promise.  The Court is aware of no Oklahoma or Tenth Circuit case finding a question of fact on the implied contract issue where there was no written policy or other promise to accompany evidence as to the remaining factors.  In *Johnson v. Nasca*, 802 P.2d 1294, 1296 (Okla. Civ. App. 1990), relied upon by Jones, the court held that pattern or practice evidence, in conjunction with a written policy in an employee handbook, could "lead reasonable minds to differing conclusions about the existence of implied contractual rights to use of the procedures."  In this case, there is not sufficient evidence for a jury to reach such a conclusion.